**Salvador CABAN, Plaintiff-Appellant,**

v.

**UNITED STATES of America, Defendant-Appellee.**

**No. 1456, Docket 83–6077.**

United States Court of Appeals, Second Circuit.

Argued June 13, 1983.

Decided Feb. 7, 1984.

---

Melvin L. Wulf, New York City (Beldock Levine & Hoffman, Leon Rosen, New York City, on brief), for plaintiff-appellant.

Steven E. Obus, Asst. U.S. Atty., New York City (Rudolph W. Giuliani, U.S. Atty. S.D.N.Y., Thomas D. Warren, Asst. U.S. Atty., New York City, on brief), for defendant-appellee.

Before FRIENDLY, KEARSE and CARDAMONE, Circuit Judges.

KEARSE, Circuit Judge:

This case, before us for a second time, *see Caban v. United States,* 671 F.2d 1230 (2d Cir.1982) (*"Caban I"*) (reversing grant of summary judgment in favor of defendant), comes to us on the appeal of plaintiff Salvador Caban from a judgment entered in the United States District Court for the Southern District of New York after a bench trial before Lee P. Gagliardi, *Judge,* dismissing his action against defendant United States for damages under the Federal Tort Claims Act ("FTCA"), 28 U.S.C. §§ 1346(b) & 2671–2680 (1976). Caban, a native of Puerto Rico and an American citizen, sued the government for damages resulting from his six-day detention by Immigration and Naturalization Service ("INS") agents when he attempted to enter the country at John F. Kennedy International Airport ("JFK Airport") from a flight originating in the Dominican Republic. At issue is whether the district court properly looked to federal law to determine the standard of care applicable to the INS agents' detention of Caban, and whether it properly concluded that the duration of the detention was not unreasonable. We affirm the district court's dismissal of Caban's complaint.

## I. BACKGROUND

### A. *Facts*

The facts, as stipulated by the parties or found by the court after trial, are as follows. On Thursday, January 5, 1978, Caban, a native Puerto Rican and an American citizen, disembarked at JFK Airport from a flight that had originated in the Dominican Republic. An INS agent stopped Caban for routine questioning to determine whether he should be permitted to enter the country. After their conversation, the agent was not convinced that Caban was an American citizen and referred Caban to another INS inspector, Beverly Gordon. Caban is illiterate and speaks only Spanish. Through an interpreter, Gordon asked Caban to produce documents to establish his citizenship. He did not have a passport but presented a recently issued birth certificate showing that he was born in Puerto Rico in 1941. To evaluate the validity of his claim of citizenship, Gordon asked Caban a number of questions about Puerto Rico and the information on the birth certificate. Caban did not know the month or date of his birth, which were stated on the birth certificate, and did not know the name of the hospital that had issued the certificate to him. Nor could he answer basic questions about Puerto Rico, such as the colors in its flag, although he claimed to have lived there until he was eighteen.

Subsequently, Caban was questioned through an interpreter by Angelo Marrone, the Supervisory Immigration Inspector at the airport. Caban's answers failed to satisfy the INS agents that his claim of citizenship was valid. The agents therefore decided to detain Caban at the INS detention center in Brooklyn, New York. A hearing was scheduled for Tuesday, January 10, 1978, to determine his status, but was postponed until January 11 at the request of his attorney. Upon posting a bond on January 11, Caban was released. It was

eventually determined that he was a United States citizen.

### B. *Caban I*

In May 1979, Caban commenced the present action pursuant to the FTCA seeking damages of $1,000,000 for alleged negligence, invasion of privacy, and false imprisonment by the INS agents who had detained him for six days without recognizing his right to enter the United States.[1] The government successfully moved in the district court for summary judgment on the ground that the action was barred by § 2680(a) of the FTCA, which provides that the government may not be sued on account of an employee's exercise of a discretionary function, whether or not the discretion involved be abused. In *Caban I,* familiarity with which is assumed, we reversed the summary dismissal of the complaint, ruling that the activities of the INS agents who detained Caban were not of the kind that involved the weighing of important policy choices to which discretion is essential within the contemplation of § 2680(a). 671 F.2d at 1232–33. In remanding for further proceedings, the *Caban I* panel declined to address the issue of what standard governed an INS determination to detain a would-be entrant, but observed that that standard was not the same as the standard for judging the legality of an arrest:

> It has long been the law that people have significantly less rights at a border than they have in the interior .... It may very well be that because of the broad power given the immigration authorities, on these facts it will be very difficult for appellant to prove that a tort was committed.

*Id.* at 1235.

### C. *The Decision after Trial*

Following a bench trial after remand, the district court concluded that Caban's complaint should be dismissed. In an opinion dated January 25, 1983 ("Opinion"), the court began by noting that under 28 U.S.C.

---

1. In accordance with 28 U.S.C. § 2675, Caban had, prior to commencing suit, presented his claim to the INS, which had rejected it.

§ 1346(b), the United States is to be held liable for the torts of its employees in accordance with the law of the place where the act occurred. The court noted that the New York Court of Appeals had defined the tort of false imprisonment as the unlawful deprivation of another's freedom to choose his own location if

> (1) the defendant intended to confine [the plaintiff], (2) the plaintiff was conscious of the confinement, (3) the plaintiff did not consent to the confinement and (4) the confinement was not otherwise privileged.

Opinion at 4 (quoting *Broughton v. State,* 37 N.Y.2d 451, 456, 373 N.Y.S.2d 87, 93, 335 N.E.2d 310, 314 *cert. denied,* 423 U.S. 929, 96 S.Ct. 277, 46 L.Ed.2d 257 (1975)). Observing that there was no dispute that Caban satisfied the first three elements of the New York definition, the court considered the matter of whether the INS agents' actions were privileged. Rejecting Caban's contention that the agents' conduct was privileged only if they had reasonable or probable cause to believe Caban had committed a crime such as false representation of United States citizenship, *see* 18 U.S.C. § 911 (1976), the court ruled that "the detention of plaintiff was privileged if the INS agents acted in conformance with the federal standards regarding treatment of applicants for entry to the United States." Opinion at 4.

The court noted further that 8 U.S.C. § 1225(b) (1976) provides that an entering alien "who may not appear to the examining immigration officer at the port of arrival to be clearly and beyond a doubt entitled to land shall be detained for further inquiry to be conducted by a special inquiry officer," and noted that a regulation promulgated under § 1225(b) provides that "[a] person claiming U.S. citizenship [either] must establish that fact to the examining immigration officer's satisfaction," or he is to be inspected as an alien. 8 C.F.R. § 235.1(b) (1983). The court found that the evidence adduced by Caban during the INS interviews had not established beyond a doubt his right to enter the United States, that the INS officials who questioned Caban were not satisfied that he was a United States citizen, and that their lack of satisfaction was not unreasonable. Opinion at 7–9. Accordingly, the court concluded that the agents had acted in conformity with applicable federal law in deciding to detain Caban.

Finally, the court found that Caban's detention, reasonable at the outset, had not become unreasonable by virtue of its duration. The court found that Caban's case had been processed, in accordance with INS policy, on a "first-in, first-out" basis, and that Caban had failed to establish that a hearing should have been scheduled for either the first day after his detention or for the weekend. *Id.* at 10. The court found that its conclusion that the detention was not unreasonably long was supported by the fact that the sixth and final day of the detention was caused by Caban's attorney, who requested a postponement of Caban's scheduled hearing. *Id.* at 11.

Having concluded that the detention of Caban was initially privileged and was not unreasonably prolonged, the court ruled that the government was not liable to Caban for false imprisonment and dismissed the complaint. This appeal followed.

## II. DISCUSSION

Caban's principal contentions on appeal are (1) that once he established a prima facie case of false imprisonment, the court should have recognized that the government had the burden of proving that his detention was justified under New York law, as contrasted with federal law; (2) that the actions of the INS agents should have been judged against the New York principles that impose liability for false imprisonment (a) upon police officers arresting a person without probable cause to believe that the person arrested has committed a crime, or (b) upon private citizens arresting a person who has not in fact committed a crime; and (3) that in any event the duration of Caban's detention resulted from the gross negligence of the INS agents in failing to investigate more thor-

oughly his claim to be a citizen. We reject the first two contentions as an erroneous interpretation of the law, and reject the last because we see no clear error in the district court's findings of fact.

## A. *The Initial Detention*

The pertinent FTCA provisions circumscribing the United States' waiver of its sovereign immunity with respect to claims of false imprisonment are set out in 28 U.S.C. §§ 1346(b), 2674, and 2680(h). Section 2680(h), as amended in 1974, specifies acts for which the United States may be sued. It provides that, as to claims arising on or after the date of the amendment, the government may be sued "with regard to acts or omissions of investigative or law enforcement officers of the United States Government ... [on] any claim arising ... out of assault, battery, false imprisonment, false arrest, abuse of process, or malicious prosecution." 28 U.S.C. § 2680(h). INS agents are "investigative or law enforcement officers" within the meaning of this section. *Caban I,* 671 F.2d at 1234 & n. 4. Section 2674 specifies the boundaries of the government's waiver of sovereign immunity—*i.e.,* the scope of its liability—with regard to the acts described in § 2680(h) and elsewhere in the FTCA:

> The United States shall be liable, respecting the provisions of this title relating to tort claims, in the same manner and to the same extent as a private individual under like circumstances ....

Section 1346(b) provides for the district court's jurisdiction of claims under the FTCA as follows:

> Subject to the provisions of chapter 171 of this title [*i.e.,* 28 U.S.C. §§ 2671–2680], the district courts ... shall have exclusive jurisdiction of civil actions on claims against the United States, for money damages, accruing on and after January 1, 1945, for injury or loss of property, or personal injury or death caused by the

negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred.

■ The reference in § 1346(b) to "[t]he 'law of the place' means the 'whole law' of the state where the incident took place." *Lambertson v. United States,* 528 F.2d 441, 443 (2d Cir.) (quoting *Richards v. United States,* 369 U.S. 1, 11, 82 S.Ct. 585, 591, 7 L.Ed.2d 492 (1962)), *cert. denied,* 426 U.S. 921, 96 S.Ct. 2627, 49 L.Ed.2d 374 (1976). Applying the state's "whole law" requires that we look to whatever law, including federal law, the state courts would apply in like circumstances involving a private defendant. *Southern Pacific Transportation Co. v. United States,* 462 F.Supp. 1193, 1213 (E.D.Cal.1978). Thus, we said in *United States v. Lambertson, supra,* "if the state would look to a state or federal statute in determining the liability of a private person for the tort in question, the same statute will be applied in measuring the conduct of the government." 528 F.2d at 444.

■ Since the INS detention of Caban occurred in New York, the district court properly began its inquiry by looking to New York's law of false imprisonment.[2] As noted by the district court, New York law does not impose liability upon a defendant who has intentionally confined a nonconsenting person if the confinement was otherwise privileged or if the defendant can show that his actions were justified by law. *E.g., Broughton v. State, supra,* 37 N.Y.2d at 458, 373 N.Y.S.2d at 94, 335 N.E.2d at 314; *Marks v. Baltimore & Ohio Railroad Co.,* 284 A.D. 251, 253, 131 N.Y.S.2d 325, 327 (1954). Under New York law, the legal justification for an alleged false imprisonment need not be found in the substantive law of New York but may be found in some

---

2. Although much of Caban's brief on appeal is devoted to discussion of principles to be applied in negligence cases, *see, e.g.,* Brief at 12–18, negligence concepts are of little pertinence to the present case since it is undisputed that the INS agents' actions were "clearly intended," *id.* at 20.

other pertinent body of law. *Id.*, 284 A.D. at 253–54, 131 N.Y.S.2d at 327 (defendant could avoid liability by showing justification under West Virginia law).

The government argues that New York's willingness to recognize justification grounded in a body of substantive law other than its own suggests that New York courts would look to federal law "in assessing whether a confinement by federal officials, acting pursuant to federal law was 'otherwise privileged'." [3] (United States' Brief at 17 (quoting *Broughton v. State, supra*).) We agree with this reading of New York law, so far as it goes. The United States has a privilege to protect its borders against unlawful entry. *E.g., Fiallo v. Bell,* 430 U.S. 787, 792, 97 S.Ct. 1473, 1477, 52 L.Ed.2d 50 (1977); *Kleindienst v. Mandel,* 408 U.S. 753, 766–67, 92 S.Ct. 2576, 2583–84, 33 L.Ed.2d 683 (1972); *Boutilier v. Immigration & Naturalization Service,* 387 U.S. 118, 123, 87 S.Ct. 1563, 1566, 18 L.Ed.2d 661 (1967). Because of this privilege, a person seeking entry into the United States has substantially less right to avoid detention than does a person already lawfully within the United States who wishes to avoid incarceration in connection with a crime. *See, e.g., United States v. Cortez,* 449 U.S. 411, 421, 101 S.Ct. 690, 696, 66 L.Ed.2d 621 (1981); *United States v. Brignoni-Ponce,* 422 U.S. 873, 880, 95 S.Ct. 2574, 2579, 45 L.Ed.2d 607 (1975). There is no presumption in favor of the would-be entrant; the burden is on him to show his right to enter without hindrance; and his burden is a heavy one. The authorities may detain him with far less than probable cause to believe he has no right to enter. In light of New York's policy of assessing a defendant's actions in accordance with the law applicable to his conduct, *see Marks v. Baltimore & Ohio Railroad Co., supra,* we infer that the New York state courts would look to federal principles in determining the standard by which INS officials' detention of a would-be entrant are to be judged. We therefore reject Caban's contention that the state courts would insist that any detention at the border be based on probable cause.

This does not necessarily end our inquiry, however, because although we agree that the New York courts would recognize the government's border protection privilege in order to exonerate "federal officials, acting pursuant to federal law" (United States' Brief at 17), we must bear in mind that § 1346(b) speaks in terms of the liability, under state law, of "a private person." Notwithstanding the government's privilege to protect its border, there is some question as to whether the New York courts would rule that a *private* individual was justified in detaining a person he suspected of being an alien in order to prevent that person from entering the United States. The privilege of protecting United States borders belongs to the United States. An authorized government agent would be privileged—indeed, would have the duty— to act to protect national borders, but it is questionable, in a situation such as that existing here, whether New York would extend that privilege to a private person. We need not, however, decide here how the New York court would rule if a private individual had detained Caban.

Even if New York law held a private person liable, that fact would not be dispositive of the question of the United States' liability in this case, because the language of § 1346(b), the jurisdictional provision, does not expand the limited waiver set forth in §§ 2674 *et seq.* Rather, § 1346(b) is expressly made "[s]ubject to the provisions of" §§ 2671–2680, and the liability that a state would impose on a private individual may not, under § 2674, be imposed on the government except in "like circumstances." The "like circumstances" language in § 2674 means that "the liabili-

---

**3.** The government also argues that state law is required to yield to federal law because of the Supremacy Clause of the United States Constitution, art. VI, cl. 2. This argument misses the point. State law is pertinent at all in a suit against the United States only because Con-

gress referred to it in § 1346(b). The issue thus is not one of the supremacy of federal law, but one of statutory interpretation as to what law Congress intended to be applied in what circumstances.

ty assumed by the Government ... is that created by 'all the circumstances,' not that which a few of the circumstances might create." *Feres v. United States,* 340 U.S. 135, 142, 71 S.Ct. 153, 157, 95 L.Ed. 152 (1950). Thus, notwithstanding any circumstances in which state law would hold a private person liable for his acts, if those circumstances are in any material respect not "like" those in which the government's act occurred, there has been no FTCA waiver of sovereign immunity.

The facts that the detention of Caban occurred in connection with his attempt to enter the United States and that he was detained by officials charged with the duty to detain certain persons attempting such entry make the circumstances of his case unlike any in which a private individual could be involved. Congress has exercised the United States' right to protect its borders against unlawful entry by enacting, *inter alia,* 8 U.S.C. § 1225(b), which provides that an alien "shall be detained" unless he appears to the examining immigration officer to be "beyond a doubt entitled" to enter. Implementing this section, an INS regulation provides that a person claiming to be a United States citizen must establish the fact of his citizenship to the examining officer's satisfaction, or he will be dealt with as an alien. 8 C.F.R. § 235.-1(b). Thus, immigration officers are accorded a special status by law which requires them to detain persons in situations also outlined by law. These circumstances are far different from those in which a person who is either thought to have committed a crime or thought to be an alien is detained by a private individual. *Cf. Feres v. United States, supra,* 340 U.S. at 141–42, 71 S.Ct. at 156–57 (relationship of soldier to his superior officer or to the government is unlike his relationship to any private individual).

▮ Accordingly, we reject Caban's contentions that the United States could be held liable for his detention under principles of New York law. The New York principles to be applied to a private person cannot be applied to the government because the circumstances surrounding this detention by government agents are materially different. The liability of the government thus must be assessed in light of the liability New York would impose upon one having a privilege to detain a would-be entrant who did not satisfactorily establish his right to enter. This interpretation of the interplay among §§ 1346(b) and 2674, the government's privilege to protect the border, and New York's recognition that a privileged detention does not result in liability for false imprisonment, lead us to the conclusion that the district court applied the proper legal principles in ruling that the United States was not liable to Caban "if the INS agents acted in conformance with the federal standards regarding treatment of applicants for entry to the United States." Opinion at 4.

▮ With regard to the merits of Caban's claim within this framework, we see no basis for concluding that any factual finding of the district court was clearly erroneous. As we noted in *Caban I,* the substance of Caban's answers to the INS officials' questions—see part I.A., *supra*—"made his claim [of United States citizenship] highly doubtful." 671 F.2d at 1231. The trial court found further that Caban's answers had been given in a hesitant and evasive manner. Opinion at 8. We see no error in the court's findings that Caban had not established "beyond doubt" his right to enter the United States; that the INS officials were in fact not satisfied that Caban was a United States citizen; and that the officials' lack of satisfaction was, in the circumstances, not unreasonable.[4] The

---

4. Caban had in his possession, in addition to the birth certificate he produced, a New York driver's license, a social security card, a notarized identification card bearing his social security number, and a union membership card bearing his address and social security number. He faults the INS officials for not asking him whether he had such documents. We do not consider this argument helpful to Caban since (1) the burden was his to satisfy the officials that he was entitled to enter, and he did not volunteer these items; and (2) such documents would not have established his citizenship, as they may be issued to aliens.

court's conclusion, therefore, that the initial detention of Caban did not violate his rights may not be overturned.

### B. The Duration of the Detention

█ Given the ultimately proven fact of Caban's citizenship, the duration of his detention was unfortunate. We cannot conclude, however, that the court's decision was clearly erroneous insofar as it held that the length of the detention was not unreasonable. Some of the delay occurred because persons detained earlier than Caban were to be processed earlier than he. The court found that the treatment of Caban was not unlike the treatment of other persons similarly detained for inquiry into their statuses. This finding is supported by testimony that Caban had been processed in accordance with the INS's policy of scheduling hearings on a "first-in, first-out" basis.

In addition, some of the delay necessarily occurred because of the weekend. Although one of Caban's witnesses, a retired immigration judge, testified that a person detained on a Thursday "should" have been brought before an immigration judge the next day, and that immigration judges were available for weekend hearings, the district court gave little weight to this testimony because the witness did not state that these views reflected INS policy rather than merely his own opinion about what the practice ought to be. It was within the province of the district judge as the trier of fact to determine what weight to accord this evidence. We cannot say that he erred in not accepting it as persuasive proof of INS policy.

Finally, it is undisputed that the last part of the delay was attributable to Caban's attorney, who requested a day's postponement of the hearing after Caban had been detained for five days. It was proper for the court to take this into account in determining whether or not the duration of Caban's detention was unreasonable.

In all the circumstances, we do not view as clearly erroneous the district court's finding that the six-day detention was not unreasonably long.

### CONCLUSION

The judgment of the district court dismissing the complaint is affirmed.

FRIENDLY, Circuit Judge, concurring:

Lurking behind the specific question here presented is the larger issue that divided the Fourth Circuit in *Norton v. United States,* 581 F.2d 390, 396 (4th Cir.), *cert. denied,* 439 U.S. 1003, 99 S.Ct. 613, 58 L.Ed.2d 678 (1978). That is whether in cases of this sort "the remedy against the government under FTCA is inextricably tied to the remedy against the individual officer under *Bivens*" (footnote omitted). Although, as shown by the opinions in *Norton,* that issue is a close one, I agree with the Fourth Circuit majority that analysis of the legislative history requires an affirmative answer even though a literal reading of 28 U.S.C. §§ 2680(h), 2674 and 1346(b) might indicate otherwise. Judge Kearse's opinion produces that result here. I write only to make clear that nothing we are saying today would call for a conclusion contrary to that reached in *Norton* in a case where the state law of immunity was less favorable to an official than the law of immunity applicable to federal officers in *Bivens* cases, as defined, e.g., in *Butz v. Economou,* 438 U.S. 478, 508–12, 98 S.Ct. 2894, 2911–13, 57 L.Ed.2d 895 (1978) and *Harlow v. Fitzgerald,* 457 U.S. 800, 102 S.Ct. 2727, 2732–39, 73 L.Ed.2d 396 (1982).

CARDAMONE, Circuit Judge:

I concur in the result but write separately because I respectfully disagree with the majority's reasoning on the standard to be applied in determining whether the immigration officials' acts were privileged.

In *Caban I* we rejected the Government's assertion that the "discretionary function exception" to the FTCA barred Caban's claim. And, although we refused to decide the "difficult" issue of the standard applicable to border detentions, 671 F.2d at 1235, we did state that the "language [of § 1225(b) and 8 C.F.R. § 235.1] goes only to

the standard of care by which the INS employees' behavior is judged." *Id.* at 1233. We further noted that, "[it] may very well be that because of the broad power given the immigration authorities, on these facts it will be very difficult for appellant to prove that a tort was committed." *Id.* at 1235. These views expressed just over a year ago in *Caban I* should be the basis for our decision now to affirm the dismissal of Caban's complaint.

Instead, the majority begins its analysis by correctly noting our duty under the FTCA to apply the whole law of the state where the incident took place. *Lambertson v. United States,* 528 F.2d 441, 443 (2d Cir.), *cert. denied,* 426 U.S. 921, 96 S.Ct. 2627, 49 L.Ed.2d 374 (1976). But then the majority continues—in my view mistakenly—to establish the proper standard of conduct for the INS officials by an application of the statutory phrases "private person" and "in like circumstances" found in 28 U.S.C. §§ 1346(b) & 2674. The majority concludes not only that the FTCA strips the government of its sovereign immunity, but also that the reference to "private person" strips the agent of his status as an immigration officer for purposes of determining the vicarious liability of the United States government. Having viewed the agent in this light under New York law, the majority then promptly clothes him—and through him the government—with a privilege by stating that here there are not "like circumstances".

In the process of reaching its ultimate conclusion that the federal statutes and regulations establish the appropriate standard for privilege, the majority looks to *Feres v. United States,* 340 U.S. 135, 71 S.Ct. 153, 95 L.Ed. 152 (1950). This seems ill-advised since *Feres* and its progeny have been limited largely to questions regarding the federal government's waiver of sovereign immunity in cases where servicemen bring suit against the government for service-related acts. *See e.g., Rayonier Inc. v. United States,* 352 U.S. 315, 77 S.Ct. 374, 1 L.Ed.2d 354 (1957). In those limited circumstances the Supreme Court fashioned an FTCA exception, based on special policy considerations applicable to the military, and found no waiver of sovereign immunity. The *Feres* doctrine plainly does not deal with substantive tort law principles, but is concerned solely with the initial question of whether the government has waived its sovereign immunity as to a certain group of plaintiffs. Only after resolving the waiver issue—a threshold jurisdictional question—should the applicable law be considered.

Congress clearly designed 28 U.S.C. § 2680(h) to give injured citizens recourse against the federal government in *Bivens* type situations. *See, e.g.,* S.Rep. No. 588, 93d Cong., 2nd Sess. (1973), *reprinted in* 1974 U.S.Code Cong. & Ad.News 2789. Thus, there is now no doubt that Congress has waived sovereign immunity when the government employee is a law enforcement official acting within the scope of his authority. *Townsend v. Carmel,* 494 F.Supp. 30, 36–37 (D.D.C.1980). Accordingly, looking to *Feres* for guidance seems singularly inappropriate in determining whether state or federal law applies.

Further, it would be anomalous to apply the same state tort standards to determine the government's liability for the acts of INS officials as we apply to "private persons" acting in a wholly different capacity. The phrase "private person" is not defined in the legislative history. But it does not mean courts are to ignore at the outset the context in which the alleged tort was committed, compelling the kind of complex reasoning in which the majority has been obliged to engage. A simpler approach, and therefore preferable in my opinion, would be to view the language in §§ 1346(b) and 2674 as relating solely to the issue of waiver of sovereign immunity. The term "private person" in the statute refers solely to the United States, and merely serves to subject the sovereign to ordinary *respondeat superior* principles. Similarly, the "in like circumstances" language seems to refer essentially to the employer-employee relationship, not the specific task being performed by the federal agent.

The government has urged that the Supremacy Clause requires the application of federal standards of privilege in this case. This seems the preferable path to follow. The FTCA directs us to state law. And, in *Richards v. United States,* 369 U.S. 1, 10–15, 82 S.Ct. 585, 591–594, 7 L.Ed.2d 492 (1962), the Supreme Court held that because the "whole law" of the state applies in FTCA actions, the state's choice of law rules must also apply. Because the "whole law" of the state must include applicable federal law, *see* Restatement (Second) of Conflict of Laws § 4, comment b (1971), the Supremacy Clause requires that the INS regulations govern here where the INS officials were acting pursuant to federal statutes in the exercise of an inherently federal function (border protection). Under this line of reasoning, courts should apply the law that a local state court would apply, *Richardson v. United States,* 645 F.2d 731, 732 (9th Cir.1981), and apply federal law if a state court would do so. *Bilderback v. United States,* 558 F.Supp. 903, 908 (D.Or. 1982). *See also Hess v. United States,* 361 U.S. 314, 318, 80 S.Ct. 341, 345, 4 L.Ed.2d 305 (1960) (where court applied federal maritime law in an FTCA case). In *United States v. Muniz,* 374 U.S. 150, 164–65, 83 S.Ct. 1850, 1858–59, 10 L.Ed.2d 805 (1963), a negligence action by prisoners against prison officials, the Court found that "the duty of care owed by the Bureau of Prisons to federal prisoners is fixed by 18 U.S.C. § 4042, independent of an inconsistent state rule." (footnote omitted). Similarly, in *Ingham v. Eastern Airlines, Inc.,* 373 F.2d 227 (2d Cir.), *cert. denied,* 389 U.S. 931, 88 S.Ct. 295, 19 L.Ed.2d 292 (1967), we held that federal FAA regulations established the standard for judging the conduct of FAA air traffic controllers under the FTCA. *See Maltais v. United States,* 546 F.Supp. 96, 101 (N.D.N.Y.1982) (application of state statutory strict liability to government contractors despite federal statute permitting delegation of safety responsibility "would encroach on the dictates of the Supremacy Clause."); *Southern Pacific Transportation Co. v. United States,* 462 F.Supp. 1193, 1215 (E.D.Cal.1978) (court bound to apply preemptive federal common law in FTCA action).

Thus, we, like a New York court, should apply that rule applicable to one who is serving as an INS official. Since the Supremacy Clause is easier to grasp and apply than the majority rationale it would tend to result in more uniformity in similar intentional tort claims brought against the federal government for the acts of its law enforcement officials. The potential for dislocation of the federal government's normal functions were federal officials to be held liable under the FTCA in cases where they had complied with applicable federal regulations is plain. Under the majority's reasoning the potential for disruption will be great in those cases where courts find that the relationship of plaintiff to the federal official is "like" one in the private area. This potential is exacerbated because the opposing argument that a government employee is never truly identical to a private person can usually also be raised. Adopting a Supremacy Clause analysis avoids these unsettling problems and provides a more logical and workable basis for the result we reach here.